**SO ORDERED.**

**SIGNED this 12 day of August, 2016.**

                                                  **Stephani W. Humrickhouse**
                                                  **United States Bankruptcy Judge**

___

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. |
| **OUTER BANKS VENTURES, INC.** | 15-06168-5-SWH |
|        DEBTOR | |
| | |
| **OUTER BANKS VENTURES, INC., RICHARD C. WILLIS, and RICHARD A. BRINDLEY,** | |
|        Plaintiffs, | **ADVERSARY PROCEEDING NO.** |
|        v. | **16-00009-5-SWH-AP** |
| **J. JEFFREY TINKHAM, J. JEFFREY TINKHAM FAMILY TRUST, and WILLIAM BRUMSEY, IV, TRUSTEE,** | |
|        Defendants. | |

**ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINT**

      The matter before the court is the motion to dismiss all claims in the Amended Complaint in the above-captioned adversary proceeding, filed by defendants J. Jeffrey Tinkham ("Tinkham")

and J. Jeffrey Tinkham Family Trust ("Tinkham Trust").[1]  A hearing was held on June 8, 2016, in Raleigh, North Carolina.

## BACKGROUND[2]

Prior to 2009, Plaintiffs Richard A. Brindley ("Brindley") and Richard C. Willis ("Willis") were engaged in efforts to develop property and wastewater treatment operations in Salvo, North Carolina, as well as Dare and Currituck Counties in North Carolina, in which defendant Tinkham, who is Willis' brother-in-law, became involved.  Prior to his participation in the projects, Tinkham allegedly gave legal advice to Brindley, Willis and the corporations they controlled, including the debtor, Outer Banks Ventures, Inc. ("debtor").[3]  On January 20, 2009,[4] Brindley, Willis and Tinkham executed an Agreement[5] whereby Tinkham agreed to provide up to $500,000.00 as a capital contribution in exchange for a one-third interest in the development project.[6]  Ex. A to Amended

---

[1] On March 3, 2016, the plaintiffs filed a Notice of Voluntary Dismissal as to William Brumsey, IV.

[2] In reciting the background facts, the court relies on the allegations within the Amended Complaint and the plain terms of the documents attached as exhibits thereto.

[3] The Amended Complaint states that Willis is the president of the debtor, but he is referred to as the vice president in the documents attached to the Amended Complaint.  Brindley is a shareholder.

[4] Brindley and Willis signed the Agreement on January 20, 2009, but Tinkham did not sign it until January 23, 2009.

[5] The Agreement is entitled "Agreement."

[6] Specifically, the Agreement contemplated that Tinkham "will receive a one-third (1/3) ownership interest in the entity (or entities) that will own the Salvo, NC property . . . . [Tinkham] will also become a one-third (1/3) owner in the entity (or entities) that will purchase Carolina Water's wastewater and water assets in Dare and Currituck Counties."  Ex. A to Amended Complaint, Doc. No. 14 at 14.

Complaint, Doc. No. 14 at 14. Pursuant to the Agreement, if certain contingencies[7] did not occur in 2009, Tinkham would have the option to convey his ownership interest in the project to Brindley and Willis and convert his capital contribution into a loan, to be paid within one year of such conversion at six percent interest per annum. Id. The contingencies were not met within the 2009 time frame, triggering Tinkham's right to convert his capital contribution into a loan. Notwithstanding that fact, the plaintiffs maintain that the parties continued working toward the original development goals, and Tinkham continued to be a legal advisor.

In June 2011, Brindley, Willis, the debtor and Tinkham executed a Credit Line Deed of Trust Note ("2011 Note"), which consolidated Tinkham's previous investment of $483,028.00 under the Agreement with two other separate advances,[8] and established a $1,000,000.00 line of credit for the plaintiffs. Ex. B to Amended Complaint, Doc. No. 14 at 15. The 2011 Note incorporated the $483,028.00 "advanced"[9] under the Agreement as follows:

> In accordance with the Agreement, no interest accrued on this sum during 2009. Commencing on January 1, 2010, interest at the rate of six percent (6%) per annum compounding monthly began to accrue on the principal sum of $483,028.00 and, as stated in the Agreement, all principal and accrued interest thereon was to be repaid prior to December 31, 2010. Said principal sum and interest has not been paid and remains outstanding.

Ex. B to Amended Complaint, Doc. No. 14 at 15. The 2011 Note provided for a maturity date of December 31, 2011 on the consolidated advances and the line of credit. Id. As security for the 2011

---

[7]Namely, if additional financing was not procured or if the Carolina Water transaction was not consummated.

[8]The 2011 Note consolidated two prior advances of $50,000.00, made on December 24, 2010, and April 20, 2011, respectively

[9]The 2011 Note refers to Tinkham's $483,028.00 capital contribution as an advancement.

Note, the debtor executed a Future Advances Deed of Trust encumbering certain real property. Ex. C to Amended Complaint, Doc. No. 14 at 18.

In 2012, after maturation of the 2011 Note,[10] Tinkham agreed to release a portion of the collateral securing the 2011 Note to facilitate a sale of some of the debtor's property. In 2013, the plaintiffs again were faced with a potential sale of other property owned by the debtor, and they sought another release of collateral from Tinkham to facilitate the sale. The plaintiffs allege that Tinkham advised them to go forward with the 2013 sale, but later changed his mind and refused to cooperate, causing suit to be threatened against the debtor by the prospective purchaser. The parties eventually resolved the dispute through a restructure of the indebtedness owed to Tinkham, which included an extension of the maturity date and an accommodation of the sale. Accordingly, on December 20, 2013, the parties executed the First Amendment to Credit Line Deed of Trust Note and Deed of Trust ("2013 Note"). The 2013 Note restated the plaintiffs' obligations under the 2011 Note and recited the fact that the 2011 Note was in default. Ex. D to Amended Complaint, Doc. No. 14 at 23. It restructured the 2011 Note to extend the maturity date from December 31, 2011 to December 31, 2015, released and substituted the collateral, and substituted the Tinkham Trust as holder of the Notes. Id. at 24. The 2013 Note also included the following waiver language:

> Each party comprising the Maker represents that he, she or it has no defense, setoff or counterclaim of any kind or nature with respect to the full payment of all sums owed under the Loan Documents. Each party comprising the Maker . . . hereby releases and forever discharges the Trust and Tinkham from all actions, causes of action, suits, proceedings, debts or claims, known or unknown, in law or in equity, which he, she or it had, now has, or could, shall or might have had, against Tinkham or the Trust, or both, by reason of any matter, cause or thing whatsoever as of the date of this Amendment.

---

[10]See Ex. D to Amended Complaint, Doc. No. 14 at 24.

4

Id. at 25.  The plaintiffs allege that they were under extreme economic duress leading up to the restructure.

On November 12, 2015, the debtor filed a petition under chapter 11 of the Bankruptcy Code. The plaintiffs initiated this adversary proceeding on February 9, 2016, and filed an Amended Complaint on March 21, 2016.  The plaintiffs assert six claims for relief: (1) constructive fraud as to the 2011 Note; (2) constructive fraud as to the 2013 Note; (3) duress as to the 2013 Note; (4) violation of N.C. Gen. Stat. § 84-13, fraudulent practice by an attorney; (5) disallowance of defendants' claims and liens against property of the estate; and (6) punitive damages.

In support of their claims, Willis and Brindley allege that a partnership with Tinkham was created by virtue of the Agreement, and that Tinkham, in his role as a partner and legal advisor, possessed superior bargaining power and control and owed them fiduciary duties.  The plaintiffs claim that Tinkham exploited his status by causing the debtor to pledge collateral and assume liability under the 2011 Note in exchange for a loan to only Brindley and Willis.  The plaintiffs further allege that Tinkham violated his fiduciary duties in procuring the 2011 Note because they allegedly received no benefit and were not fully informed of their rights.  In addition to breaching his fiduciary duties, the plaintiffs maintain that, in procuring the 2011 Note, Tinkham failed to disclaim or limit his attorney-client relationship status with the plaintiffs, and used confidential information he obtained during the course of his legal representation to the plaintiffs' detriment.

The plaintiffs additionally allege that Tinkham remained a partner with Willis and Brindley until December 2013, and until that point, continued to owe them a duty of utmost good faith and integrity.  Tinkham allegedly breached his duties when he failed to fully disclose that he was reverting from a partner to a creditor.  By seeking to maintain and expand upon the benefit he

received under the 2011 Note and by executing the 2013 Note, the plaintiffs allege that Tinkham was in continuous violation of his fiduciary duties. Further, the plaintiffs allege that Tinkham's actions in procuring and seeking to enforce the 2011 Note instead of facilitating the 2013 sale of collateral placed them in severe financial distress, and they had no option but to cede to Tinkham's demands in executing the 2013 Note.

Based upon the foregoing allegations, the plaintiffs seek disallowance of the proof of claim filed by the Tinkham Trust,[11] avoidance of the 2011 Note and Deed of Trust, double damages pursuant to N.C. Gen. Stat. § 84-13 and punitive damages.

In response to the Amended Complaint, the defendants filed a motion to dismiss on April 11, 2016. As grounds for dismissal, the defendants assert that plaintiffs have failed to state a claim upon which any relief can be granted, that the forum selection provision in the loan documents requires dismissal under the common law doctrine of *forum non conveniens*, and that the comprehensive waiver contained within the 2013 Note is a complete bar to any potential liability.

### DISCUSSION

In reviewing a Rule 12(b)(6) motion, the court must view the pleadings in the light most favorable to the non-moving party and accept all factual allegations as true. See In re Caremerica, Inc., 409 B.R. 737, 747 (Bankr. E.D.N.C. 2009). The Supreme Court has held that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). That requires more than a plain statement

---

[11]As mentioned above, the Tinkham Trust was assigned the Notes under the 2013 Note.

requesting relief; instead, a factual basis for the relief sought must be established. See Twombly, 550 U.S. at 570. Moreover,

> [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Iqbal, 556 U.S. at 678 (internal citations omitted) (citing Twombly, 550 U.S. at 556).

The court turns first to the defendants' argument that the plaintiffs' claims were waived under the comprehensive waiver and release provision in the 2013 Note. The plaintiffs contend that the waiver and release provision is unenforceable because the 2013 Note was signed under economic duress. For reasons set forth below, the court will enforce the waiver in full defense of the claims asserted by the plaintiffs.

The U.S. Court of Appeals for the Fourth Circuit has held that a waiver provision will be enforced unless it: (1) was obtained through intentional misconduct; (2) was not knowing and voluntary; or (3) would thwart the legislative policy behind the statute in question. Ballard v. Bank of Am., N.A., 734 F.3d 308, 313 (4th Cir. 2013). Similarly, the Supreme Court of North Carolina has recognized the enforceability of such provisions in accordance with general principles of contract interpretation. See Ussery v. Branch Banking & Trust Co., 368 N.C. 325, 335-36, 777 S.E.2d 272, 279 (2015). "One who executes a written instrument is ordinarily charged with knowledge of its contents." Id. Accordingly, parties are generally free to agree to waive rights, so long as the waiver is intentional and with knowledge of the right being waived. Id.

Waiver provisions have specifically been found enforceable in the context of loan modification and restructuring agreements. See Ballard, 734 F.3d at 314; Ussery, 368 N.C. at 338,

7

777 S.E.2d at 281; RL Regi N.C., LLC v. Lighthouse Cove, LLC, 367 N.C. 425, 425-26, 762 S.E.2d 188 (2014). Notable to courts in the loan modification context is that the waiver at issue "was not a precondition . . . to receive the . . . loan, but rather it was a negotiated settlement." Ussery, 368 N.C. at 337, 777 S.E.2d at 280 (quoting RL Regi at 430, 762 S.E.2d at 191); see also Ballard, 734 F.3d at 314. "In exchange for a lender's willingness to restructure loans after default, a guarantor may waive prospective claims against the lender." RL Regi at 425-26, 762 S.E.2d at 188; see also Ballard, 734 F.3d at 314. A waiver provision obtained in exchange for a loan restructuring provides a benefit for both parties: "a means of escaping default for the borrower, and protection against future claims for the lender." Ballard, 734 F.3d at 314. Indeed, enforcement of waiver provisions is incumbent to the ability of borrowers to refinance – if courts declined to enforce such provisions, lenders would certainly be more reluctant to work with borrowers to restructure loans. Id.

In defense to enforcement of the waiver and release provision, the plaintiffs assert that the 2013 Note was procured under economic duress. They allege that Tinkham's actions in attempting to enforce the 2011 Note at a time when he knew that the debtor was contractually obligated to sell some of the collateral placed them in dire economic distress. Allegedly, Tinkham advised Willis to proceed with the sale of the collateral, but subsequently refused to cooperate at the time of closing, resulting in threatened litigation against the debtor. The plaintiffs claim that this situation caused them economic duress and enabled Tinkham to force the execution of the 2013 Note. The plaintiffs also maintain that this was the first indication that Tinkham intended to relinquish his partnership status in exchange for creditor status.

Economic duress involves the "illegitimate use of economic power outside the bounds of a contract or the law." Bob McLemore and Co., Inc. v. Branch Banking & Trust Co. (In re Maco

Homes, Inc.), No. 95-2938, 1996 WL 511494, at *4 (4th Cir. Sept. 10, 1996) (citing Rose v. Vulcan Materials Co., 282 N.C. 643, 665, 194 S.E.2d 521, 536 (1973)). Courts have recognized four factors necessary to establishing economic duress:

> (1) a threatened breach that the promised performance will not be received and that breach will result in irreparable injury; (2) the threat is effective because of economic power not derived from the contract itself; (3) the threatened party could not enter into a contract with a third party replacing the threatening party, i.e., the party could not obtain the "goods" from another source of supply; and (4) there is no immediate legal remedy available.

Superior Performers, Inc. v. Meaike, No. 1:13CV1149, 2015 WL 3823818, at *4 (M.D.N.C. June 19, 2015). Essentially, duress exists where one's unlawful acts induce another to enter a contract or perform or forego to perform some act under circumstances which deprive him of his free will. Bell Bakeries, Inc. v. Jefferson Standard Life Ins. Co., 245 N.C. 408, 419, 96 S.E.2d 408, 416 (1957).

A wrongful or illegal act is a crucial component of duress. "Illegality is the foundation on which a claim of coercion or duress must exist," id., but in absence of illegality, a wrongful act constitutes duress if the intent is to coerce a transaction grossly unfair and unrelated to the subject matter of the proceedings. Helena Chemical Co. v. Rivenbark, 45 N.C. App. 517, 521, 263 S.E.2d 305, 308 (1980). However, a threat to do what one has a legal right to do cannot constitute duress. Bell Bakeries, 245 N.C. at 419, 96 S.E.2d at 416. Duress also will not be found if factors in addition to the wrongful act induce the other party to enter into an agreement. Housing, Inc. v. Weaver, 37 N.C. App. 284, 295-96, 246 S.E.2d 219, 225 (1978), *aff'd*, 296 N.C. 581, 251 S.E.2d 457 (1979).

The court finds that the plaintiffs have not adequately pleaded economic duress. First, and most importantly, the plaintiffs' allegation that Tinkham advised Willis to go forward with the 2013 sale, but then refused to cooperate by releasing his security interest, does not by itself indicate any

wrongdoing or breach of duty by Tinkham. Absent from the Amended Complaint is any allegation that Tinkham agreed to release his security interest or that he had an obligation to do so. In the absence of a duty or obligation to facilitate the sale, it could not have been wrongful or unlawful for Tinkham to refuse to release his security interest. Tinkham was entitled to stand on his legal rights. See Bell Bakeries, 245 N.C. at 419, 96 S.E.2d at 416 (threat to do what one has a legal right to do is not duress); see also In re Maco Homes, Inc., 1996 WL 511494, *4 (defendants had the legal right to threaten foreclosure in light of plaintiffs' default, and doing so did not constitute duress).

The court also does not give merit to the allegation that Tinkham acted wrongfully and to the detriment of the plaintiffs by taking advantage of his superior bargaining power. Instead of possessing independent economic power that allowed Tinkham to impose severe economic pressure on the plaintiffs, the documents establish that Tinkham merely acted in accordance with his contractual rights. One of the alleged sources of Tinkham's superior bargaining power was his legal representation of the plaintiffs, but this was economic power legitimately granted to him pursuant to the parties' voluntary dealings.[12] Additionally, the 2011 Note provides that each party had an opportunity to secure independent legal counsel, and the 2013 Note indicates that the plaintiffs were represented by independent counsel.[13] Further, any superior bargaining power stemming from Tinkham's ability to cash out of the alleged partnership was merely a creature of contract, as it was

---

[12]Also, various allegations in the Amended Complaint show that the plaintiffs benefitted from his representation and advice. The plaintiffs allege that Tinkham rendered valuable legal assistance to the debtor in various matters, and helped formulate business strategies to protect and promote the debtor's interests. Amended Complaint, Doc. No. 14 at 4.

[13]The 2013 Note directs all notices and communications intended for the plaintiffs to be delivered to "Karen M. Crowley, Esq." The plaintiffs have not disputed that they were represented in connection with the 2013 Note.

expressly bargained for and agreed to by the parties in the Agreement.  See Rose, 282 N.C. at 665, 194 S.E.2d at 536 (economic duress may be found where the economic power is *independent* from the contract itself).  Conversion of Tinkham's status to that of a creditor was always a possibility because the Agreement granted him the option of converting his initial contribution into a loan.  Ex. A to Amended Complaint, Doc. No. 14 at 14.  Accordingly, any coercive power of Tinkham was derived from economic power legitimately granted to him.  Performance Sales & Mktg., LLC v. Lowe's Cos., Inc., No. 5:07cv140, 2010 WL 2294323, at *7 (denying motion to dismiss duress claim where defendant was plaintiff's sole source of income; finding that the "coercive power of [defendant's] threat in the present case was derived from its status as sole patron of [plaintiff's] business and not from any economic power legitimately granted to [defendant] . . ."); see also Rose, 282 N.C. at 665, 194 S.E.2d at 536 (duress where defendant refused to sell stone at the agreed upon price when defendant was the sole supplier of stone).

Also, the court finds that the plaintiffs have not plausibly alleged that they were deprived of their free will or that they faced irreparable injury to their business.  The factual allegations in this case are a far cry from those which courts have found sufficient to state a claim for or constitute duress.  See Performance Sales & Mktg., 2010 WL 2294323, at *7 (defendant threatened to withhold money that was essential to the continuation of plaintiff's business operations); Radford v. Keith, 160 N.C. 41, 45-46 584 S.E.2d 815, 818-19 (2003) (plaintiff was detained in defendant's office for two hours before she agreed to sign note); Fallston Finishing, Inc. v. First Union Nat'l Bank, 76 N.C. App. 347, 333 S.E.2d 321 (1985) (trial court erred in refusing to submit issue of economic duress to jury; plaintiffs had two options: enter agreement, or watch four companies collapse); Weaver, 37 N.C. App. at 297-98, 246 S.E.2d at 226-27 (defendants threatened to destroy the whole project if

plaintiffs did not enter agreement); Rose, 282 N.C. at 666, 194 S.E.2d at 536 (plaintiff's options were to cede to defendant's demands or go out of business); Link v. Link, 278 N.C. 181, 195, 179 S.E.2d 697, 705 (1971) (evidence to support finding of duress where husband threatened to take children from wife to coerce her to transfer her property to him without consideration). The plaintiffs actually benefitted from the 2013 Note, which extended the maturity date on the previous advances despite the occurrence of defaults and released and substituted collateral. Ex. D to Amended Complaint, Doc. No. 14 at 23-24. The court has not found any case where a party was found to have been deprived of its free will so as to constitute duress while still receiving benefits under a transaction. Further, the court is persuaded by other indicators that the plaintiffs acted freely and voluntarily: Willis and Brindley were experienced developers;[14] the parties had many dealings with each other, as evidenced through the Agreement, 2011 Note, 2013 Note, and the various other advancements and substitutions of collateral; and the 2013 Note contains language whereby Brindley, as vice president of the debtor, acknowledges receipt of adequate consideration.[15] These dealings evidence the "considerable free-will bargaining between them," as ultimately resolved by the 2013 Note. Reynolds v. Reynolds, 114 N.C. App. 393, 399, 442 S.E.2d 133, 136 (1994) (various factors led court to find plaintiff did not act under economic duress). "This bargaining process eliminates any validity to plaintiff[s'] argument that [they] entered into the agreement only because [they were] faced with circumstances amounting to duress." Id. at 399, 442 S.E.2d at 137; see also

---

[14]Pertinently, the court has gleaned from the Amended Complaint that, prior to Tinkham's involvement, Brindley and Willis were partners in a general partnership seeking to develop property and wastewater treatment operations, and that Brindley and Willis were actively participating in business ventures and in the debtor. See Amended Complaint, Doc. No. 14 at 3.

[15]The 2013 Note also states that "Brindley is the Vice President of [the debtor] and familiar with its business operations." Ex. D to Amended Complaint, Doc. No. 14 at 24.

Ussery, 368 N.C. at 335-36, 777 S.E.2d at 279 (exchange between the parties was bargained for and resulted in a negotiated benefit to both sides; determining enforceability of waiver provision in light of rules of contract interpretation and noting that contracts are construed as a whole and their purport gathered from the four corners of the document); Richard A. Lord, Williston on Contracts § 71:7 (4th ed.) (scope of economic duress doctrine is limited, because "ordinary hard bargaining is not only acceptable, but indeed, desirable, in our economic system, and should not be discouraged by the courts.").

Further, the 2013 Note could not have been procured as a result of a breach of Tinkham's alleged fiduciary duties because at that time he had already disclaimed his partner status, which he was contractually permitted to do. Any alleged breach of fiduciary duty occurred in connection with the 2011 Note, prior to the execution of the 2013 Note, and thus was waived. See George Shinn Sports, Inc. v. Bahakel Sports, Inc., 99 N.C. App. 481, 488, 393 S.E.2d 580, 584 (1990) (finding no duress; alleged duress arose from circumstances existing prior to partnership agreement, several months prior to the agreement plaintiff sought to enforce and which reaffirmed the validity of the partnership agreement). It is abundantly clear that parties may agree to waive claims and defenses, and such provisions are enforceable. The plaintiffs have failed to state a claim for economic duress surrounding the 2013 Note, and the court finds that the waiver provision is enforceable.

## CONCLUSION

In light of the court's finding that the plaintiffs have not plausibly alleged the existence of duress, they have not stated a viable defense to enforcement of the waiver provision contained within

the 2013 Note. Accordingly, the court finds that it is enforceable, and it operates as a bar to the plaintiffs' claims in their entirety.[16]  The Amended Complaint is hereby **DISMISSED**.

**END OF DOCUMENT**

---

[16]The court notes that the fourth cause of action for violation of N.C. Gen. Stat. § 84-13, fifth cause of action for disallowance of claims and liens against property of the estate, and sixth cause of action for punitive damages are actually remedies and do not provide independent bases for relief.  Accordingly, and in light of the court's dismissal of the substantive claims for constructive fraud and duress, these causes of action are necessarily dismissed as well.